**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

O2 MEDIA, LLC,               )
                                    )
          Plaintiff,          )
                                    )
           v.               )     No. 15 C 05129
                                    )
NARRATIVE SCIENCE INC.,     )     Judge John J. Tharp, Jr.
                                    )
          Defendant.       )

**MEMORANDUM OPINION AND ORDER**

This is a case in which the plaintiff seeks to enforce three related business method patents for a computer-assisted process of generating financial reports and news stories relating to selected data. The plaintiff, O2 Media, LLC ("O2 Media"), brings suit against the defendant, Narrative Science Inc. ("Narrative Science"), alleging patent infringement in violation of the Patent Act, 35 U.S.C. § 271 *et seq*., and breach of the Illinois Uniform Deceptive Trade Practices Act ("UDTPA"), 815 ILCS 510/2. The asserted patents were all issued before the Supreme Court "threw cold water"[1] on business method patents that claim the automation of otherwise generic processes in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014). Because the patents are directed to an abstract and generic concept—the process of identifying, organizing, and reporting relevant data—and fail to imbue that process with any significant innovative concept, they are invalid under the framework set forth in *Alice*. Accordingly, Narrative Science's motion to dismiss is granted.

---

[1] *Balshe LLC v. Ross,* Nos. 14–1274, 14–2497, 2015 WL 4480752, *1 (7th Cir. July 23, 2015).

O2 Media is a holding company that publishes websites for investors and licenses content to institutional clients in the investment industry, such as Standard & Poors, Fidelity, TDAmeritrade, NASDAQ.com, and CBOE. Am. Compl. ¶ 1, ECF No. 8. O2 Media is the sole owner and assignee of U.S. Patent Nos. 7,856,390 ("'390 patent"), 8,494,944 ("'944 patent"), and 8,676,691 ("'691 patent"). *Id*. ¶ 6. The United States Patent and Trademark Office ("USPTO") issued the '390 patent, entitled "System, Report, and Method for Generating Natural Language News-based Stories," on December 21, 2010 (with a priority date of June 6, 2007). *Id*. ¶ 7. The '944 patent is a continuation-in-part of the '390 patent and was issued on July 23, 2013 (with a priority date for at least one of its claims of June 6, 2007). *Id*. ¶ 8. The '691 patent is the third in the family, issued on March 18, 2014 (also with a priority date for at least one of its claims of June 6, 2007). *Id*. ¶ 9. The patents "generally relate[ ] to a system, report, and method for automatically generating a series of natural language news-based stories to be presented via a digital interface or printed publication to a portfolio user." '390 Patent 2:58-61; '944 Patent 3:24-27; '691 Patent 3:24-27, ECF No. 1-1 Exs. A-C.

Narrative Science created data-driven communications software—Quill—that uses a computer interface to allow users to select and analyze data, to generate natural language narratives based on that data, and to disseminate those narratives on a large scale. Am. Compl. Ex. D. As such, it can be used to identify data relevant to a portfolio of financial instruments and to generate strategy reports and natural language news stories based on the selected data. Am. Compl. ¶ 17. Quill is available for use in a number of industries, including financial services,

---

[2] For purposes of this motion, the Court takes the following facts alleged by O2 Media in its Amended Complaint as true. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

government, staffing services, marketing services, and sports. *Id*. ¶ 14. O2 Media claims that Narrative Science's software, "when used in some or all of its possible ways," infringes on O2's three patents at issue, that Narrative Science offers Quill to potential O2 Media clients, and that Narrative Science allows third parties to infringe the methods covered in the patents at issue. *Id*. ¶¶ 17-18.

O2 Media gave Narrative Science notice of its ownership of the patents at issue on March 25, 2015. *Id*. ¶ 19. Narrative Science did not thereafter obtain a license to use O2's patents nor did it cease offering Quill. *Id*. O2 Media filed suit in June 2015 alleging patent infringement and violation of the Illinois UDTPA. Narrative Science now moves to dismiss the Complaint.

## DISCUSSION

### I. Patent Validity Under 35 U.S.C. § 101

Narrative Science's motion to dismiss is premised on the basis that each of the patents at issue are directed to "abstract ideas" and are therefore invalid under 35 U.S.C. § 101. Section 101 of the Patent Act identifies the subject matter that is eligible for patent protection: "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." The Supreme Court has recognized, however, that § 101 "contains an important implicit exception [for l]aws of nature, physical phenomena, and abstract ideas . . . ." *Alice,* 134 S. Ct. at 2354. For over 150 years the Court has recognized this exception as necessary to prevent monopolization of the "'basic tools of scientific and technological work'" that "'might tend to impede innovation more than it would tend to promote it,' thereby thwarting the primary object of the patent laws." *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012)). Narrative Science maintains that the patents at issue are invalid because they claim the abstract idea of "using templates to write stories about selected topics." Mem. in Supp. 1, ECF No. 15.

**A.      Ripeness of Narrative Science's Motion to Dismiss**

A threshold question that O2 Media raises is whether this Court should determine the patents' validity under § 101 before claim construction. Resp. 8, ECF No. 21. Although it "will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis," *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012), claim construction is not necessary if the asserted claims, read most favorably to the patent holder, still describe an abstract idea. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014) (endorsing the district court's construction of all claim terms "in the manner most favorable to [the patent holder]" in deciding § 101 eligibility on a motion to dismiss); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 719 (Fed. Cir. 2014) (no formal claim construction required when "there was no reasonable construction that would bring [the claims] within patentable subject matter" (internal quotation marks omitted)). To overcome the presumption of validity of a patent claim under 35 U.S.C. § 282, a § 101 challenge must satisfy a "clear and convincing" standard. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011) ("We consider whether § 282 requires an invalidity defense to be proved by clear and convincing evidence. We hold that it does.").

Narrative Science's motion to dismiss is ripe for adjudication, then, so long as all terms in the patent claims are construed in the manner most favorable to O2 Media. *Market Track, LLC v. Efficient Collaborative Retail Mktg., LLC*, No. 14 C 4957, 2015 WL 3637740, at *2 (N.D. Ill. June 11, 2015), *appeal dismissed* (Sept. 8, 2015) (deciding 12(c) motion prior to claim construction, construing all terms in the light most favorable to the patent holder). The only two disputed terms identified by O2 Media are "template" and "news generating algorithm." O2 Media submits that "template" means "something that takes incoming data and creates new

output data based on the incoming data," Resp. 9, and that "news generating algorithm" means "a six-step process that somebody must go through to program a computer." Oral Arg. Trans. 5:20-21, ECF No. 27. Accordingly, the Court will employ those constructions in evaluating Narrative Science's invalidity challenge.

### B. The Supreme Court's Two-Step *Mayo* Test

Although § 101 excludes "laws of nature, natural phenomena, and abstract ideas" from patent protection, inventions that "integrate" such laws, phenomena, or ideas "into something more" are patentable. *Alice*, 134 S. Ct. at 2354-55. In *Mayo Collaborative Services v. Prometheus Laboratories., Inc.*, 132 S. Ct. 1289 (2012), the Supreme Court set forth a two-step test for determining whether a claimed invention is sufficiently transformative to be a patentable application of such laws, phenomena, or abstract ideas. *Id.* at 1296-97. First, the court must determine whether the claims at issue are directed to the excluded content—*i.e.*, a law of nature, natural phenomena, or abstract idea. *Id.*; *see also Alice*, 134 S. Ct. at 2355. If so, the court then determines whether there is an inventive concept: considering "the elements of each claim both individually and 'as an ordered combination' [the court must] determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1297-98).

Shortly after crafting the two-step test in *Mayo*, the Supreme Court applied the test to computer-implemented methods in *Alice*, invalidating "a method of exchanging financial obligations between two parties using a third-party intermediary to mitigate settlement risk." *Alice*, 134 S. Ct. at 2356. Applying step one of the *Mayo* test, the Supreme Court concluded that the patented method was an abstract concept and noted that "the concept of intermediated settlement is a fundamental economic practice long prevalent in our system of commerce." *Id.* (quoting *Bilski v. Kappos*, 561 U.S. 593, 611 (2010)). Turning to the second step, the Court held

that the claimed invention lacked any inventive concept and was little more than implementation of "the abstract idea of intermediated settlement on a generic computer." *Alice*, 134 S. Ct. at 2357-59. The Court made clear that adding computer-assisted automation to otherwise conventional processes does not supply a sufficiently inventive concept to satisfy the *Mayo* standard. To be an inventive concept, the claims must "do more than simply instruct the practitioner to implement the abstract idea . . . on a generic computer," *Alice,* 134 S. Ct. at 2359, and must claim more than "the improved speed or efficiency inherent with applying the abstract idea on a computer." *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015) (citing *Bancorp Services,* 687 F.3d at 1278 ("[T]he fact that the required calculations could be performed more efficiently via a computer does not materially alter the patent eligibility of the claimed subject matter.")). In applying the *Mayo* test, the Supreme Court reiterated its concern "'that patent law not inhibit further discovery by improperly tying up the future use of' these building blocks of human ingenuity." *Alice*, 134 S. Ct. at 2354 (quoting *Mayo*, 132 S. Ct. at 1301).

In *Market Track*, this Court recently summarized the application of the *Mayo* test in *Alice* and reviewed a number of post-*Alice* Federal Circuit decisions analyzing invalidity challenges to business method patents involving computer-assisted processes. *Market Track*, 2015 WL 3637740, at *3-5; *see also Digitech Image Technologies, LLC v. Electronics for Imaging, Inc.*, 758 F.3d 1344, 1350-51 (Fed. Cir. 2014) (concluding that method claims were merely a "process of taking two data sets and combining them into a single data set . . . [and] a process that employs mathematical algorithms to manipulate existing information to generate additional information is not patent eligible"); *buySAFE, Inc. v. Google, Inc.,* 765 F.3d 1350 (Fed. Cir. 2014) (holding that method of automatically creating third-party transaction guarantees was an

abstract idea that was "beyond question of ancient lineage"); *Ultramercial*, 772 F.3d at 714-17

(holding ineligible for patent protection an eleven-step method for "displaying an advertisement

in exchange for access to copyrighted media," despite the additional limitation of consulting an

activity log, which was a mere "insignificant 'data-gathering step[ ]'"); *Content Extraction,* 776

F.3d at 1345-48 (no inventive concept in patent claim for extracting data from hard copy

documents and storing that information in electronic memory because "humans have always

performed these functions," and the software used to extract the data "was well-known at the

time of filing"). Since then, the list has only grown longer. *See, e.g., Vehicle Intelligence and*

*Safety LLC v. Mercedes-Benz USA, LLC*, No. 15–1411, 2015 WL 9461707, at *1 (Fed. Cir. Dec.

28, 2015) (affirming district court's invalidation of patent purporting to claim computer-assisted

monitoring of driver impairment); *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1333

(Fed. Cir. 2015) ("Using organizational and product group hierarchies to determine a price is an

abstract idea [about] . . . a basic conceptual framework for organizing information"); *Intellectual*

*Ventures*, 792 F.3d at 1367-68 (holding that "tracking financial transactions to determine

whether they exceed a pre-set spending limit (i.e., budgeting)" is an abstract idea implemented

with "generic computer elements"); *Internet Patents Corp. v. Active Network, Inc.,* 790 F.3d

1343, 1344 (Fed. Cir. 2015) (affirming invalidity finding regarding patent purporting to disclose

a method and system for maintaining data submitted for online forms where patent set forth only

conventional processing steps); *OIP Technologies, Inc. v. Amazon.com, Inc.*, 788 F.3d 1359,

1360-61 (Fed. Cir. 2015) (affirming invalidity finding regarding patent purporting to disclose a

pricing method for use by online merchants where purported patent required only routine data

collection and processing activities).[3]

---

[3] This Court is aware of no case decided post-*Alice* in which the Federal Circuit has held

*Alice* and this torrent of subsequent Federal Circuit cases holding process and method patents invalid teach that district courts should "take Section 101 seriously, apply it early, and check the *bona fides*" of the concept underlying the patent. David Swetnam-Burland, Stacy O. Stitham, *Alice's Adventures in Oz: Revealing the Man Behind the Curtain*, 9 Akron Intell. Prop. J. 29, 44 (2015) (collecting post-*Alice* cases applying its two-part test). Heeding that lesson, district courts are applying the two-step *Alice* test to patents "at the motion to dismiss, motion for judgment on the pleadings, or summary judgment stages; doing so conscientiously and deliberatively; and reaching decisions that penetrate the often murky language in which patent claims are drafted to reveal the 'inventive concept' within." *Id*. at 41. *See also* Mark Patrick, *The Federal Circuit and Ultramercial: Software and Business Method Patents Tumble Further Down the Rabbit Hole*, 64 Am. U. L. Rev. 1089, 1110 (2015) ("[F]ederal court decisions since the Supreme Court's decision in *Alice Corp.* have demonstrated a clear shift in the federal courts toward a narrower view of what constitutes patent-eligible subject matter.").

### C.     O2 Media's Patents

Turning to the patent claims at issue in this case, Narrative Science argues that Claim 1 of the '390 Patent is representative, Mem. in Supp. 2, whereas O2 Media argues that Claim 18 of the '390 Patent and Claim 6 of the '944 Patent are more favorable to the patent holder and, therefore, should be used as the representative claims. Resp. 5 (citing *Content Extraction*, 776 F.3d at 1349). Interpreting the terms and claims "in a manner most favorable to [the patent

---

that a business method patent based on a computer-assisted but otherwise abstract or conventional process supplied an innovative concept. In *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257-59 (Fed. Cir. 2014), the Federal Circuit upheld a jury verdict regarding a patent for retaining website visitors who click on ads, but did so on the ground that the patent, which was directed to a unique, "Internet-centric" problem—retaining a website visitor who clicks on a hyperlink embedded in the website—was not directed to an abstract idea.

holder]," the Court begins its analysis with Claim 18 of the '390 Patent.[4] *Content Extraction*, 776

F.3d at 1349.

Claim 18 of the '390 Patent recites:[5]

> [13] A system for generating natural language news-based stories relating to financial instruments held in a portfolio, the system comprising:
>
> a computer connected to an Internet, the computer comprising a memory and a central processing unit in functional communication with the memory, and a software executed by the central processing unit in the memory, the software being used to selectively execute either a strategies page or a news report with a plurality of natural language news stories for a plurality of financial instruments held in a portfolio as defined by a portfolio manager; and
>
> a data retrieval system connected to the Internet in data connection with the computer, with a user interface, a central processing unit connected to the user interface, and a display, wherein the software generates the news report based on a news brief for a plurality of financial instruments in the portfolio, wherein each news story includes a date of publication, a news item rewritten in natural language using a template from a news brief with a news-generating algorithm with sentence and paragraph reconstruction to simulate natural language selected from a plurality of templates each with input variables and at least a data field, and wherein the data retrieval system retrieves either the strategies page or the news report from the personal computer via the Internet for display to the portfolio user.
>
> [14] wherein the plurality of financial instruments held in the portfolio is defined by the portfolio manager using a management tool.

---

[4] Narrative Science argues that "all claims of the Asserted Patents are directed to abstract ideas," Mem. in Supp. 7, and that "even were this Court to use O2 Media's proposed claims as representative, it would not change the result that none of its claims are patent eligible." Reply 6. As such, this Court will focus on O2 Media's proposed representative claims.

[5] Claim 18 refers to the system of Claim 15, which refers to the system of Claim 14, which refers to the system of Claim 13. *See* '390 Patent 9:26–10:34. Here, the Court combines the four claims for ease of analysis.

[15] wherein the management tool includes a selection of financial instruments taken from a group consisting of analyst favorites, momentum plays, hedged dividend income, stocks in the news, manual selection, related news line items, or stocks with a common push factor.

[18] wherein the management tool further includes a function selected from a group consisting of submitting changes to a defined portfolio table, recovering daily default values for the portfolio table, or updating live webpages.

'390 Patent 9:26–10:34.

Claim 6 of the '944 Patent recites:

The system of claim 5 [A system of generating natural language news-based stories of items of interest held in a portfolio, the system comprising:

a computer connected to an Internet, wherein the computer comprising a memory and a central processing unit in functional communication with the memory, and

a software executed by the central processing unit in the memory, wherein the software being used to selectively execute either a strategies page or a natural language news stories page with a plurality of natural language news stories of a plurality of items of interest held in a portfolio as defined by a management tool of the selection of items of interest; and

a data retrieval system connected to the Internet in data connection with the computer, with a user interface,

a central processing unit connected to the user interface, and

a display;

wherein the software generates either a strategies page or a natural language news stories page based on data from each of a plurality of items of interest in the portfolio, wherein each natural language news story as part of the natural language news stories page includes a date of publication, a news item rewritten in natural language using a template from a news brief using an [sic] news-generating algorithm with sentence and paragraph construction to simulate natural language from a partly numerical format data selected from a plurality of templates each with input variables and at least a data field from the data, and wherein the data retrieval system retrieves either the strategies page or the natural language news stories page from the personal computer via the Internet;

wherein the algorithm with sentence and paragraph construction includes a series of boilerplate sentences to be repeated in a round-robin method; and

wherein terms part of the boilerplate sentences are varied using a parsing table.]

wherein the algorithm with sentence and paragraph reconstruction to simulate natural language include any one of the list:

merging information, removing irrelevant data, conforming dates for convenience, conforming dates for consistency.

'944 Patent 11:28–12:6.

## 1.    *Mayo* Step One

Under *Mayo*'s first step, the Court looks to whether the claimed system is directed to an abstract idea. The claims describe an automated system that retrieves selected financial data from the Internet, analyzes and organizes that data, and produces an output file consisting either of a report recommending specific transactions or a natural language news story reporting and analyzing the relevant data. O2 Media concedes it is not claiming the software that converts the data into a "strategy report" or "natural language news story" (or any of the intermediate steps necessary to do so), Oral Arg. Trans. 15:3–17:5; rather, O2 is claiming the *idea* of filtering selected financial data into these formats. But culling pertinent data from sources and presenting

that data in a useful format is about as generic and abstract a process as can be imagined. What report has ever been generated by any process that did not involve the selection of the appropriate data followed by the organization and presentation of that data to the intended audience? The sophistication of the data and the technical implementation of the process may vary, but the core concept that O2 Media describes—find data, organize it, and present it—is not in the least unique to its claimed invention; fourth graders engage in the same generic process when they prepare a homework report on snakes or butterflies. The invention O2 Media claims is founded upon an abstract and routine process used in countless manual and automated applications; as such, it is an "abstract idea, devoid of a concrete or tangible application." *Ultramercial*, 772 F.3d at 715; *see also Content Extraction*, 776 F.3d at 1347 (holding that collecting, processing, and storing data were "undisputably well-known" abstract ideas); *Digitech*, 758 F.3d at 1351 (holding that "a process of gathering and combining data" from multiple sources was an abstract idea); *Market Track*, 2015 WL 3637740, at *5 ("processing a query and returning results, deriving content from those results, and then organizing and delivering that content somewhere" is an abstract concept). The claims contain a number of limitations, including but not limited to, the designation of use for portfolio managers, including the date of publication of the data being reported, the use of a management tool for selecting certain financial data, and the use of a parsing table for sentence variation in the creation of natural language news stories. The enumerated limitations in the claims, however, do not change the fact that the claims are founded upon an abstract idea and they therefore have no relevance to the first step of the *Mayo* inquiry; any relevance they may have bears on the inventive concept question in the second *Mayo* step. *See Ultramercial*, 772 F.3d at 715. Like so many of the method and process patents recently invalidated by the Federal Circuit, this system, too, claims

what is in fact a highly abstract, generic, and ubiquitous concept: it is the idea of identifying, organizing, and presenting information.

The identification, organization, and presentation of information is inarguably a building-block of the modern "information age." *See* Carl Shapiro & Hal R. Varian, *Information Rules: A Strategic Guide to the Network Economy* 9 (2013) ("Improved information infrastructure has vastly increased our ability to store, retrieve, sort, filter, and distribute information, thereby greatly enhancing the value of the underlying information itself."). *See also* James Gleick*, The Information: A History, a Theory, a Flood*, Prologue (2011) ("The telephone, the fax machine, the calculator, and, ultimately, the computer are only the latest innovations devised for saving, manipulating, and communicating knowledge. . . . Each new information technology, in its own time, set off blooms in storage and transmission. From the printing press came new species of information organizers: dictionaries, cyclopaedias, almanacs—compendiums of words, classifiers of facts . . . ."). Information is only valuable if it is accessible and capable of dissemination, and improvements to the ease of access or dissemination enhance the value of existing information. Shapiro, *supra*, at 9. "The basic concept of selecting a useful subset of data from a larger stored pool of data, organizing it for review, and disseminating the collected and organized results to others is the fundamental process by which information is used and shared in the modern economy." *Market Track*, 2015 WL 3637740, at *7 (citing Shapiro, *supra*, at 91-92 (describing business models built around indexing content and either charging for access to paid content or for analytical or search tools for processing free content)). Indeed, the basic system here is a necessary process in any attempt to analyze and disseminate data; "humans have always performed these functions." *See Content Extraction*, 776 F.3d at 1347. Like the concepts the Supreme Court and the Federal Circuit have recently found to constitute building blocks of the

modern economy, including, for example, intermediated settlement (*Alice*), risk-hedging (*Bilski*), third-party guarantees (*buySAFE*), collecting, identifying, and storing data (*Content Extraction*), and automated budgeting (*Intellectual Ventures*), this, too, "is a building block, a basic conceptual framework for organizing information." *Versata Dev.*, 93 F.3d at 1333-34. Indeed, the abstract idea at the heart of these three patents is essentially the mirror image of the abstract idea present in *Content Extraction*, namely: "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory." 776 F.3d at 1347. Just as in *Market Track*, the patents here are "directed toward the reversal of the same three steps: reading through [ ] data, recognizing certain information within that [ ] data, and presenting that information in a human-readable format."[6] 2015 WL 3637740, at *7.

O2 Media appropriately takes issue with Narrative Science's description of the concept at the heart of the patent claims as "using templates to write stories about selected topics," both because (as noted above) the claims must be construed in the light most favorable to O2 Media and because that description ignores much of the claim language, but winning this battle of claim construction does not help O2 Media win the war. O2 Media maintains that the patent claims "do not define the inventions as using templates . . . [in] identifying, organizing and presenting information," Resp. 13, but rather "describe an automated method for portfolio managers and others to expeditiously and efficiently obtain information related to particular topics of interest

---

[6] O2 Media did not cite *Market Track* in its brief or attempt to distinguish its claims from those this Court recently found patent-ineligible in that case. When asked about *Market Track* at oral argument (the Court noting that while *Market Track* is not dispositive of the invalidity challenge here, its analysis is likely to inform this Court's decision), O2 Media did not disagree with that decision. *See* Oral Arg. Trans. 33:3-4 ("Your honor did not get it wrong in *Market Track*."). Instead, O2 Media simply argued that the difference between the cases is that here, there is no abstract idea, and even if it is abstract, the multiple inventive concepts—"the creation of narrative natural news story based text in addition to the process of speeding up the analysis that a financial advisor is going to have to go through"—are sufficient to merit patent protection. Oral Arg. Trans. 32:18–33:13.

that would otherwise be diffused across the internet and then transform the collected information into an easy-to-understand, natural language format." *Id.* But that is just to say, at greater length, that the patents describe an automated method to identify ["obtain information related to particular topics of interest"], organize and analyze it ["transform the collected information"], and present it [in "an easy-to-understand, natural language format"]. Describing the process in more detail does not change the fact that the method claimed is actually quite basic and abstract: (1) find the relevant information; (2) organize and analyze it; and (3) present it in a usable format.

O2 Media also argues that its patents do not rest on an abstract idea because they do not preempt all other ways to identify, organize, and present information. It asks the Court to consider whether the patents would be infringed if someone else practiced the ideas. Resp. 13-15 (citing *Trading Techs. Int'l, Inc. v. CQG, Inc.*, No. 05-cv-4811, 2015 WL 774655, at *4 (N.D. Ill. Feb. 24, 2015)). The Federal Circuit, however, has recently and repeatedly rejected this argument as "meritless," *Vehicle Intelligence and Safety*, 2015 WL 9461707 at *3, stating, in a case affirming the invalidity of a patent covering a natural phenomenon, that "[w]hile preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility." *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015). O2 Media's attempt to highlight the limits of its claims and that they do not preempt all uses of "a template to write stories about selected topics," Resp. 15, "does not change the conclusion that the claims are directed to patent ineligible subject matter." *Ariosa Diagnostics*, 788 F.3d at 1379 ("Where a patent's claims are deemed only to disclose patent ineligible subject matter under the *Mayo* framework, . . . preemption concerns are fully addressed and made moot.").

This is because step two of the Mayo test requires an inventive concept. A patent is not invalid simply because it is based upon an abstract idea; an application of an abstract idea that supplies an inventive concept can survive a § 101 challenge. That prior art references reveal that other patents may be based on the same generic processes does not mean that prior art patents are necessarily invalid by reason of their abstract foundation. As the Federal Circuit has explained, were the plaintiff's preemption argument accepted, "all a patentee would need do to insulate itself from a § 101 challenge would be to identify a single prior art reference in the specification and state that its invention improves upon that reference." *Vehicle Intelligence & Safety,* 2015 WL 9461707 at *3.[7]

### 2. *Mayo* Step Two

The mere fact that O2 Media's patents are based on an abstract concept does not mean that they are invalid. Under the second step of the *Mayo* analysis, this Court must determine whether the patents add "an inventive concept . . . that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, 134 S. Ct. 2347 (quoting *Mayo*, 132 S. Ct. at 1294). Although its brief raises two "inventive concepts," O2 Media raised an additional three "inventive concepts" at oral argument; the five asserted "inventive concepts" are: (1) generation of either a strategies page or a news stories page; (2) the manner in which the news stories page is created—*i.e.* inclusion of a date of publication and "a news item rewritten using very specific technology"; (3) the six-step algorithm; (4) the PTO's Notice of Allowance; and (5) the management tool. Resp. 15-18; *see* Oral Arg. Trans. 12:4–14:7, 17:8–20:1. The Court will address each in turn.

---

[7] Narrative Science's assertion, at oral argument, that its own patents "present no conflict" with O2 Media's patents because the Patent Office allowed Narrative Science's patents to issue over the O2 Media patents is no more persuasive. Oral Arg. Trans. 25:9-20.

Although there are other systems permitting portfolio managers to access relevant financial data and present it in formats useful to their clients, O2 Media argues that the ability to review that data in multiple formats (the strategies page and the natural language page) is "novel and inventive and provides users with an enhanced ability to process large amounts of raw information more efficiently." Resp. 16-17. Processing information and presenting that information in a new format, regardless of whether it is one or more new formats, is precisely the "well-understood, routine, conventional activit[ies]" computers inherently perform. *Alice*, 134 S. Ct. at 2359 (quoting *Mayo*, 132 S. Ct. at 1294). Moreover, O2 Media is not claiming the software that converts the data into these new formats, only the idea of presenting information in multiple formats, which is not at all inventive. *See Digitech Image*, 758 F.3d at 1351 ("organizing this information into a new form" is not inventive); *cf. Market Track*, 2015 WL 3637740, at *8 ("When executing the abstract idea of identifying and presenting stored information, that information must of course be presented in some form . . .").

O2 Media next contends that the "manner in which the news stories page is created" is inventive because it includes a date of publication and uses "very specific technology." Resp. 17. Inclusion of a date of publication in a news piece, while useful and informative, is in no way inventive; news stories routinely include publication dates and search results for web browsers routinely display the publication dates for the items included in those results. The "very specific technology" claimed, moreover, isn't specific at all. The patent does not claim the software or equipment that would be employed to generate the news story; rather, it "contemplates all known methods of implementing on a central processor . . . using software having a method of creating natural language from text . . . ." '390 Patent 6:3-6. So far as the patents are concerned, the technology that creates the natural language news stories is a black box created by someone else.

The idea of creating natural language narratives with computers is of course not inventive—if it were, there would as yet be no software designed to do so. And there is nothing novel or particularly insightful about the idea of using natural language software specifically to create narratives relating to financial information. Why would it be? Financial reporting and analysis—both public and private—is a mainstream and indispensable feature of our modern economy.

Further, the six-step algorithm that O2 claims as an additional inventive concept, Resp. 17-18; Oral Arg. Trans. 13:1–14:7, 17:8-15, appears to be nothing more than a more detailed description of the process by which computer software creates natural language text. The news generating algorithm includes: "(1) sentence and paragraph reconstruction, (2) input variable with a data field, (3) a series of boilerplate sentences, (4) a system to repeat the boilerplate sentences in a round-robin method, (5) use of a parsing table, and (6) one of merging information, removing irrelevant data, conforming dates for convenience, and conforming dates for consistency." Resp. 18. This "ordered combination" of steps offers no inventive concept that is not already inherent in the concept on which natural language software is based, namely repeatedly massaging and manipulating text through an automated process until there is sufficient and appropriate variation to resemble natural language. As already explained, this reorganization of data using a combination of computer equipment and software is merely the implementation an abstract idea using generic computer functions. *See Alice*, 134 S. Ct. at 2359 ("[E]ach step does no more than require a generic computer to perform generic computer functions."); *Intellectual Ventures*, 792 F.3d at 1371 ("Requiring the use of a 'software' 'brain' 'tasked with tailoring information and providing it to the user' provides no additional limitation beyond applying an abstract idea, restricted to the Internet, on a generic computer."); *Content Extraction*, 776 F.3d at 1348 ("There is no 'inventive concept' in [plaintiff's] use of a generic

scanner and computer to perform well-understood, routine, and conventional activities commonly used in industry."). To this routine application of database and computer technology, the patents add no innovation whatsoever. Notably, the patents do not disclose any technical description of *how* the steps in the process take place or claim any improvement over the process by which such software operates. And, again, O2 Media concedes that it is not claiming the software that actually performs each of these steps, *see* Oral Arg. Trans. 14:10–17:6, and that some other software could be substituted in at various steps—*i.e.*, a different parsing software—to accomplish the same result. Oral Arg. Trans. 16:11-22. "It is difficult to understand how a process . . . which depends on no particular system or software for its implementation, provides a 'concrete' or 'particularized' limitation on the abstract concept of identifying, organizing, and presenting data." *Market Track*, 2015 WL 3637740, at *7.

O2 Media also points to the PTO's Notice of Allowance as evidence that the patents set forth an inventive concept, Resp. 18-19, arguing that the ordered combination of claims, if insufficient individually, is sufficiently inventive as an ordered group. *Id*. Ex. B. That the PTO granted the patents is certainly not dispositive of the patents' validity, for the same is true in any case where an alleged infringer claims patent invalidity. *See, e.g.*, *Mayo*, 132 S. Ct. at 1296. Moreover, the "ordered combination" addressed in the Notice of Allowance:

> wherein the news stories page comprises a plurality of natural language news stories, each including a date of publication, a story rewritten in natural language using a template from a news brief with a news-generating algorithm with sentence and paragraph reconstruction to simulate natural language selected from a plurality of templates each with input variables and at least a data field.

Resp. Ex. B 2, is merely a rewording of the uninventive six-step algorithm discussed and rejected above.

The last inventive concept O2 Media claims is the "management tool," which permits a user to select and filter from various options of what financial information to search and to include in the output page. *See* Oral Arg. Trans. 18:6–19:5. The management tool is similar to the '382 "interactive interface" claimed by the patent held to be invalid in *Intellectual Ventures*: it, too, presents customized webpage content based on user-specific information. 792 F.3d at 1365. Here, the tool to provide tailored information to the user involves nothing more than "the breakdown and organization of [ ] data according to some criteria, . . . and the transmission of information derived from that [ ] data to a computer user, all through the use of conventional computer components, such as a database and processors, operating in a conventional manner." *Id.* (quoting *Intellectual Ventures*, No. 1:13-CV-00740 AJT, 2014 WL 1513273, at *3 (E.D. Va. Apr. 16, 2014)); *see also Versata Dev.*, 793 F.3d at 1335 ("The steps in [plaintiff's] claims (e.g., arranging, storing, retrieving, sorting, eliminating, determining) are conventional, routine, and well-known. They involve the normal, basic functions of a computer."); *Market Track*, 2015 WL 3637740, at *8 ("Using a computer to display query results in a preselected format using prepackaged software is not the least bit inventive.").

In defending the inventiveness of its patents, O2 Media highlights the problems its system attempts to solve, including discerning relevant information within the overwhelming "sea of information," doing so with sufficient speed, and structuring the relevant information in an easy-to-understand format. *See* Resp. 2-3; '390 Patent 1:28-30, 1:56-59, 2:1-5. O2 Media claims that its system seeks to solve these problems "by creating an automated method for portfolio managers and others to expeditiously and efficiently obtain information that would otherwise be diffused across the Internet and review the information in an easy-to-understand, natural language format." Resp. 3. The problem of the availability of a large amount of

information and the resulting need to efficiently cull through that information, while certainly exacerbated by the Internet, is not an Internet-specific problem under *Mayo* step-two. *Compare DDR Holdings*, 773 F.3d at 1257 (patent addressed Internet-specific problem of retaining website visitors who would be transported to another webpage after clicking on advertisement hyperlink), *with Ultramercial*, 772 F.3d at 714, 716 ("offering free media in exchange for watching advertisements," although never previously employed on the Internet, was merely an attempt to limit an abstract idea "to a particular technological environment"). Moreover, courts have routinely rejected the "computers are more efficient" argument as an inventive implementation of an abstract idea. *See Intellectual Ventures*, 792 F.3d at 1370 ("[O]ur precedent is clear that merely adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility on an otherwise abstract idea."); *Versata Dev.*, 793 F.3d at 1335 (using a computer "must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations.").

### 3. Machine-or-Transformation Test

In a final effort to demonstrate the inventiveness of its patents, O2 Media invokes the machine-or-transformation test. Resp. 19. The machine-or-transformation test looks to whether a claimed process (1) "is tied to a particular machine or apparatus," or (2) "transforms a particular article into a different state or thing." *Ultramercial*, 772 F.3d at 716. Although a § 101 analysis of patentable subject matter must follow the *Mayo* two-step framework, the machine-or-transformation test is still "a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under § 101." *Bilski*, 561 U.S. at 604.

O2 Media claims that its inventions "scan information that is presently dispersed across the Internet, employ software and algorithms to locate information relevant to the end user,

aggregate that information and *transform the information* into reports and natural language news-based stories." Resp. 19 (emphasis added). Merely invoking the word "transform" is insufficient to satisfy the test, however, especially when, as here, the "transformation" is solely converting existing data into a new form. *See Bancorp Services*, 687 F.3d at 1273 (affirming that "the claims do not effect a transformation, as they 'do not transform the raw data into anything other than more data'"); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1375 (Fed. Cir. 2011) ("The mere manipulation or reorganization of data, however, does not satisfy the transformation prong."); *Market Track*, 2015 WL 3637740, at *11 (The "manipulation of digital data, such as performing a relational query on a computer database . . . does not satisfy the transformation prong of the machine-or-transformation test."). O2 Media did not cite any cases to support its data transformation argument nor did the Court find any support for O2's argument; thus, the machine-or-transformation test fails to save O2 Media's patents.

### 4. The Remaining Claims in the '390, '944, and '691 Patents

The remaining claims in the '390, '944, and '691 Patents are invalid "because all the claims are substantially similar and linked to the same abstract idea." *Content Extraction,* 776 F.3d at 1348. None of the limitations in the dependent claims narrows in any meaningful way the basic abstract idea at the heart of Claim 18 of the '390 Patent or Claim 6 of the '944 Patent (or the independent claims included therein). Each of the claim limitations, such as producing the result in the form of a computer file (Claim 10 of the '390 Patent), adding a header (Claim 19 of the '390 Patent), or selecting results from preset criteria (Claims 7 and 8 of the '944 Patent and the '691 Patent) are well-understood, routine, and conventional uses and configurations of databases. Like O2's suggested representative claims, nothing in the remaining claims is in any way inventive.

Thus, even when considered in a light most favorable to O2 Media, none of its patent claims amount to "significantly more" than the abstract idea of identifying financial data, organizing that data according to certain criteria, and presenting that information in a new format, all of which is implemented using generic computer functions. *See Alice*, 134 S. Ct. at 2347 (quoting *Mayo*, 132 S. Ct. at 1294). Because O2 Media's patents are directed to an abstract idea and lack any inventive concept, Narrative Science's motion to dismiss the patent infringement claim is granted.

## II.  Illinois Uniform Deceptive Trade Practices Act

O2 Media asserts that Narrative Science is engaging in deceptive trade practices, in violation of 815 ILCS 510/2(a)(5) and (12), by:

> advertis[ing], offer[ing], generat[ing,] and sell[ing] a software which it knows its clients believe is legal and does not infringe any third-party rights. Those in the industry who know of Plaintiff and its patented methods, customers and/or third parties may be misled into thinking that Defendant's Quill software is produced under a valid license or does not infringe Plaintiff's technology, all in violation of Section 2 of the UDTPA.

Am. Compl. ¶ 28. The Court has supplemental jurisdiction over this claim. Normally, when "all federal claims in a suit in federal court are dismissed [ ], the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *Al's Serv. Ctr. v. BP Products N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010). But here, where the supplemental state law claim turns on the very same issue that the court has already addressed, concerns of judicial economy and federal intrusion into areas of purely state law are minimized, and there is little reason not to address the state claim as well. *See RWJ Mgmt. Co. v. BP Products N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012); *see also Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015) *cert. denied*, 136 S. Ct. 200 (2015) (district court did not abuse discretion in retaining jurisdiction over state law claim post-dismissal of federal claim where both claims were based on

the same set of facts). Narrative Science argues that this UDTPA claim is solely premised on Narrative Science's alleged infringement of the patents and that, if the patents are invalid, there is no need for a license and, thus, there is no plausible UDTPA claim. Mem. in Supp. 14-15. The Court agrees.

O2 asserts that its UDTPA claim is not solely premised on Narrative Science's alleged patent infringement, but, rather, is directed at the potential consumer confusion regarding Narrative Science's lack of a license: "Plaintiff has alleged that Defendant is misleading parties who are familiar with Plaintiff and its patented methods into thinking that Defendant's software is produced under a valid license." Resp. 21. O2 Media has not explained why consumers would have believed that Narrative Science had a license from O2 Media; that assumption seems no more warranted than an assumption that no license was required (either because Narrative Science's product did not infringe any patent owned by O2 Media or because O2 Media's asserted patents were invalid). The Amended Complaint includes no allegations that Narrative Science misrepresented that it had a license or in any way implied that it had licensed O2's patents. Either way, because a UDTPA claim does not provide a cause of action for damages but solely for injunctive relief, *see Chicago Dist. Council of Carpenters Pension Fund v. Reinke Insulation Co.*, 464 F.3d 651, 659 (7th Cir. 2006), and because O2 Media's patents are not valid, there is nothing for this Court to enjoin relevant to the UDTPA claim. *See Madsen v. Dep't of Prof'l Regulation*, No. 99 C 0344, 2000 WL 1222189, at *9 (N.D. Ill. Aug. 24, 2000) *aff'd*, 12 F. App'x 382 (7th Cir. 2001) (if there are no present or future violative actions, there is nothing for the Court to enjoin). Thus, O2 Media's UDTPA claim is dismissed for failure to state a claim.

*       *       *

For the reasons set forth above, the Court finds that all of the claims of U.S. Patent Nos. 7,856,390, 8,494,944, and 8,676,691 are invalid. Accordingly, the Court grants Narrative Science's motion to dismiss in its entirety.


Dated: February 25, 2016

_____
John J. Tharp, Jr.
United States District Judge